E-FILED
Thursday, 19 February, 2015 03:55:35 PM
Clerk, U.S. District Court, ILCD

IN THE
UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF ILLINOIS
PEORIA DIVISION

| | |
|---|---|
| MARK D. BRODRICK,<br>  Plaintiff,<br><br>v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br>  Defendant. | Case No. 1:13-cv-01528-SLD-JEH |

### Report and Recommendation

Now before the Court is the Plaintiff's, Mark D. Brodrick's, Motion for Summary Judgment (Doc. 11) and the Commissioner of Social Security's, Carolyn W. Colvin's, Motion for Summary Affirmance (Doc. 15). The Plaintiff appeals from the denial of his application for Social Security Disability Insurance Benefits under Title II of the Social Security Act and for Supplemental Security Income under Title XVI. 42 USC § 405(g); 42 USC § 1381 *et seq*. This matter has been referred for a Report and Recommendation. Text Order entered March 11, 2014. The Motions are fully briefed, and for the reasons stated herein, the Court recommends that the Commissioner's Motion for Summary Affirmance be GRANTED and the Plaintiff's Motion for Summary Judgment be DENIED. [1]

### I

On August 17, 2010[2], Brodrick filed a Title II application for Disability Insurance Benefits (DIB) and Title XVI application for Supplemental Security

---

[1] References to the pages within the Administrative Record will be identified by AR [page number]. The Administrative Record appears as (Doc. 9) on the docket.
[2] While the Administrative Record Court Transcript Index, Disability Determination and Transmittal, and the ALJ identify the date as August 17, 2010, the documents appearing in the Administrative Record are dated September 2, 2010.

1

Income (SSI). (AR 119, 126). In his applications, Brodrick alleged disability beginning on November 17, 2009. (AR 119, 126). The claims were denied initially on December 1, 2010, and were then denied upon reconsideration on February 25, 2011 (AR 68, 71). On April 18, 2011, Brodrick filed a timely request for hearing concerning his application for DIB and SSI. (AR 86-87). A hearing was held before the Honorable Robert H. Schwartz (ALJ) on March 26, 2012 via video, during which time Brodrick appeared without an attorney or representative. Following the hearing, the ALJ rendered an unfavorable decision on June 14, 2012. (AR 18). Brodrick's request for review by the Appeals Council was denied on September 30, 2013, making the ALJ's decision the final decision of the Commissioner. (AR 1-3). Brodrick filed the instant civil action seeking review of the ALJ's decision on November 6, 2013.

## II

At the time he applied for DIB and SSI, Brodrick was 47 years old living with his wife and youngest son in Galesburg, Illinois. (AR 31). He was a high school graduate who had previously worked as an assembler of metal furniture, a material handler, an automobile mechanic, and most recently (beginning September 1, 2011) babysitter to his grandson. (AR 16, 32, 218). He alleged disability as of November 17, 2009 because of 3 shoulder, 2 knee, and left ankle surgeries, elbow problems, carpal tunnel, depression, losing grip, and a re-injured shoulder. (AR 75). Brodrick had previously applied for DIB and SSI on May 14, 2007, alleged disability as of October 20, 2006, and was denied November 16, 2009. (AR 55-63). In the November 16, 2009 Decision, the ALJ, Barbara J. Welsch, identified the severe impairments of history of right rotator cuff tear with surgical repairs during the period 2004-2005 and right inguinal hernia repair on May 31, 2007. (AR 57).

At the hearing on March 26, 2012 before ALJ Schwartz for the claims at issue in this case, Brodrick testified that he used the handrail at his home to climb the stairs because he had his knees operated on a couple of years before and he still had a little weakness in his knees "now and then." (AR 32). He testified that he was then taking a break from babysitting his grandson because of his recent shoulder surgery in February 2012 and his resulting decision to wait until after he went through a session or so of therapy. (AR 32). He was paid $59 per month from his son and daughter-in-law and $11 or so per day from the state to babysit his grandson. (AR 33). Brodrick testified that after his third shoulder surgery on his right shoulder, his employer at the time let him go because he was a liability risk. (AR 34). Brodrick testified that before his last surgery (his fourth shoulder surgery) in February 2012, raking, using the lawnmower, or using the weed eater would cause his arm to go numb and that he used Tylenol for the shoulder pain a couple times of day or maybe once every couple of days depending upon what he was doing. (AR 36).

Brodrick testified that since his knee surgeries, most of the time they were okay but sometimes they would lock up or he would get pain getting up and down. (AR 37). He testified that his knees are aggravated now (as of the date of the hearing) sometimes when he gets up and down, walks long distances, stands for a long period of time, or sits for long periods of time. (AR 37). He also testified that he had never taken medication for depression and that he was depressed at the time of the hearing because he could not find a job and because of his shoulder, he would not be able to get a job again. (AR 38). Brodrick said he had some hand stiffness and cramping but that his doctor said that hopefully it was just from Brodrick's recent surgery and the use of a sling. (AR 39). He testified that he had problems grasping and picking up small objects with his right hand and that he dropped things with his right hand, though he said that

his problems with his right hand were worse in the last month before the hearing. (AR 40). Brodrick further testified that while he could not even lift his right arm to reach over his head, that inability was only since his last surgery. (AR 41). He said that the doctor told him to go to therapy to see how it would go in regard to limitations after recovery from surgery. (AR 41). He testified that the doctor also said that Brodrick would never be the same, and that Brodrick could do just about anything to tear or rip the rotator cuff again and that it would not take much to do it because the shoulder had undergone four surgeries. (AR 41).

Brodrick testified that the farthest he typically walked was two to three blocks, that he had "[a] little, not a lot" of problems walking, that he had difficulty standing for long periods of time, and that before his surgery, he was carrying his 25-pound grandson. He testified that he did not notice he had any balance problems but that he did have problems squatting, crouching, and crawling. (AR 42). Brodrick also testified that he was still able to do most chores around the house if he took more breaks, but that his arm sometimes got sore. (AR 42). He said that washing and drying dishes and using his right hand inside a glass in a rotating motion were particularly difficult, and that his shoulder was bothered by starting his lawn mower or weed eater. (AR 43).

After listening to Brodrick's testimony, the ALJ posed his first hypothetical question to the vocational expert (VE) Ronald Malik: whether a person of Brodrick's age, education, and work experience would be able to perform his past work if he was restricted to lift, carry, push, and/or pull no more than 20 pounds occasionally, no more than 10 pounds frequently, never climb ladders, ropes, or scaffolding, could climb ramps and/or stairs, kneel, crouch, and/or crawl no more than occasionally, and never reach overhead with his right upper extremity. Malik responded that such a person would not be able to perform

4

Brodrick's past work. (AR 45). Malik testified that, based upon that hypothetical, the following were representative jobs that could be performed by such a person: routing clerk, small product assembler, and wire assembler. (AR 45). When the ALJ asked Malik whether any of those jobs required more than frequent use of the hands for grasping and fingering, Malik responded that the small product assembler job did, and in place of that job would be the job of fastener. (AR 45). The ALJ's second hypothetical assumed the same restrictions but included a limitation that the individual use his dominant right upper extremity for reaching no more than occasionally and no more than occasionally handling, grasping, and fingering. Malik responded that the available jobs would be renter consultant, usher, and a children's attendant. (AR 46). The ALJ's third hypothetical further limited such a person's exertional requirements to lift, carry, push, and/or pull up to 10 pounds occasionally and less than 10 pounds frequently, the ability to stand and/or walk for at least two hours and to sit for about six hours in a typical eight-hour workday, to use his right upper extremity for frequent reaching, frequent handling and fingering, to never use his right upper extremity for overhead reaching, and to keep all other postural limitations as in hypothetical one. Malik responded that the jobs of circuit board assembler, document prep clerk, and order caller were representative jobs. (AR 46). Finally, the ALJ asked Malik to assume the sedentary limitations in the third hypothetical, and to further assume that the individual had no more than occasional use of his right upper extremity for reaching in any direction, handling, or fingering. Malik responded that the job of order caller would remain, and the additional jobs of surveillance system monitor and referral clerk. (AR 47).

The ALJ then heard testimony from Brodrick's wife. The ALJ asked Mrs. Brodrick to focus on the time period before her husband's most recent

aggravation to his right shoulder in detailing the problems she noticed with his shoulder and knees. (AR 49). Mrs. Brodrick testified that when her husband raised his right arm he would get it up so far that it would lock in place and would take him forever to get it to go down to where he could even remotely use it. (AR 49). She testified that Brodrick had fallen down before he had his knees done. (AR 49). Mrs. Brodrick testified that it was harder for her husband to hold their grandson with his shoulder being the way it was. (AR 49). She testified to Brodrick's hands going numb when he was just moving and that she had seen him drop things, though not constantly. (AR 50).

### III

In his written Decision, the ALJ applied the standard five-step sequential evaluation process and ultimately found that Brodrick was not disabled from November 17, 2009 through the date of the ALJ's decision (June 14, 2012). (AR 18). The ALJ determined that Brodrick satisfied Step One because he had not engaged in substantial gainful activity during the period since his alleged onset date of November 17, 2009. (AR 10). At Step Two, the ALJ found that Brodrick suffered from the following severe impairments: degenerative joint disease right rotator cuff, status/post 4 surgeries; degenerative joint disease of the knees; and a history of left ankle fracture with reduced range of motion. (AR 11).

In considering which of Brodrick's impairments were severe, the ALJ discussed Brodrick's allegations of disabling hand symptoms involving stiffness and cramping. (AR 11). The ALJ noted that Brodrick testified to such symptoms occurring "a lot" since his most recent shoulder surgery in February 2012, and the ALJ noted Mrs. Brodrick's testimony regarding her husband's hands. (AR 11). The ALJ discussed consultative examiner, Dr. Afiz Taiwo's, November 5,

6

2010 report in which he indicated that Tinel[3] and Phalen[4] tests were negative for the bilateral wrists, that there was 5/5 grip strength in both hands and the normal ability to grasp and manipulate objects, that Brodrick was able to fully extend the hands, make fists, and oppose the fingers, and that the range of motion of the wrists was not limited. (AR 11). The ALJ also discussed Brodrick's report to consultative examiner Jeanne Yakin, Ph.D., on October 11, 2010 that with help he cooked, cleaned house, vacuumed, did laundry, watered the lawn, mowed the grass, gardened, took care of pets and took care of children. (AR 11). Brodrick also reported to Dr. Yakin that he went shopping alone, prepared a shopping list, counted change, wrote checks, and independently did personal care and took care of his clothing. (AR 11). Dr. Michael Gernant's March 22, 2012 treatment notes indicated that Brodrick reported some symptoms including a little numbness in the ring finger. Dr. Gernant noted that "we are going to watch this. Hopefully it's just a little compression from the sling." (AR 11). Dr. Gernant advised Brodrick to discontinue the use of the sling and that he would start aggressive physical therapy. (AR 11). The ALJ also discussed Brodrick's hearing testimony which mirrored what he reported to Dr. Yakin. Ultimately, the ALJ concluded that Brodrick's hand symptoms had no more than a minimal effect on his ability to perform work activity.

In regard to Brodrick's mental health status, the ALJ noted Brodrick's testimony that he was depressed because he could not find a job, though he took no medication for a mental health problem nor sought mental health treatment.

---

[3] "Tinel sign" is defined as a "tingling sensation in the distal end of a limb when percussion is made over the site of a divided nerve. It indicates a partial lesion or the beginning regeneration of the nerve." *Dorland's Medical Dictionary*, 32nd ed., s.v. "tinel."

[4] "Phalen test" is defined as "the size of the carpal tunnel is reduced by holding the affected hand with the wrist fully flexed or extended for 30 to 60 seconds, or by placing a sphygmomanometer cuff on the involved arm and inflating to a point between diastolic and systolic pressure; appearance of numbness or paresthesias indicates carpal tunnel syndrome." *Dorland's Medical Dictionary*, 32nd ed., s.v. "phalen test."

(AR 11). The ALJ discussed how Dr. Yakin diagnosed Brodrick with depressive disorder, NOS and global assessment functioning of 57. (AR 11). The ALJ specifically discussed evidence in the record pertaining to Brodrick's activities of daily living (each was articulated), social functioning (mild limitation), concentration, persistence, or pace (no problems identified by Brodrick himself or Dr. Yakin), and no episodes of decompensation. (AR 12). The ALJ ultimately concluded that Brodrick's medically determinable mental impairment was non-severe.

At Step Three, the ALJ found that the medical evidence did not establish that Brodrick had an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (AR 13). The ALJ gave attention to listing 1.02 (major dysfunction of a joint(s)). The ALJ identified all four of Brodrick's right shoulder surgeries, and discussed at length the last of the surgeries which occurred on February 22, 2012 for rotator cuff repair. (AR 13). The ALJ discussed Dr. Gernant's March 1, 2012 follow up note that Brodrick's tear was "quite repairable" and that Brodrick's complained of symptoms on March 22, 2012 might be the result of compression from the sling used following surgery. (AR 13). As for Brodrick's knees, the ALJ detailed Brodrick's reports to his primary care physician, Dr. Robert Wagner, and his reports to Dr. Gregory Schierer (orthopedic referral) in May 2010. The ALJ discussed Brodrick's bilateral arthroscopic surgery performed on both knees on June 1, 2010, that he had physical therapy, and that his physical therapy note dated July 23, 2010 noted that Brodrick met all goals and so he was discharged from physical therapy. (AR 14). Dr. Schierer gave Brodrick a steroid injection in the right knee on July 28, 2010 and advised Brodrick on August 25, 2010 to increase his activities. (AR 14). When Dr. Yakin saw Brodrick on October 11, 2010 for a consultative psychological exam, she observed no problems with

8

Brodrick's ambulation, balance, or posture, and she noted that he walked 15 minutes to their appointment. (AR 14). Dr. Taiwo noted at his physical examination of Brodrick on October 11, 2010 that Brodrick reported that his knees would occasionally give out and lock. The examination showed Brodrick could walk more than 50 feet without support, his gait was non-antalgic without the use of assistive devices, he was able to perform toe/heel walk, and the range of motion of his knees was not limited. (AR 14). Brodrick reported to Dr. Taiwo that his left ankle swelled and ached with changes in the weather, and that he had on and off pain and occasional pain with walking. (AR 14). Dr. Taiwo's active range of motion testing of the left ankle showed limitation. (AR 14-15). Ultimately, the ALJ determined that the evidence failed to establish the inability to ambulate effectively or to perform fine and gross movement effectively, as required by listing 1.02. (AR 15).

The ALJ found that Brodrick had the residual functional capacity (RFC) to perform light work, except he could never climb ladders, ropes, or scaffolding, but could climb ramps and/or stairs, kneel, crouch, and/or crawl no more than occasionally, and could never reach overhead with his right upper extremity. (AR 15). In making his RFC determination, the ALJ discussed Brodrick's history of right shoulder surgeries, his use of Tylenol before the most recent surgery, his testimony that the use of a power mower or weed eater made his shoulder pain worse, that his arm would go numb from use of the computer or a rake, that he experienced on and off knee pain for several years, that his knees were not as bad since surgery in June 2010, and that Norco was identified as his only medication as of March 26, 2012. (AR 15-16). The ALJ further explained how the evidence revealed that Brodrick engaged in a relatively active lifestyle despite his health problems, and that the opinion evidence from State Agency evaluators

pertaining to Brodrick's limitations were consistent with those found by the ALJ himself. (AR 16).

At Step Four, the ALJ determined that Brodrick was unable to perform any past relevant work. (AR 16).

At Step Five, the ALJ determined that Brodrick could perform a significant number of jobs that exist in the national economy. (AR 17). The ALJ considered Brodrick's age, education, work experience, and RFC in conjunction with the Medical-Vocational Guidelines 20 CFR Part 404, Subpart P, Appendix 2, and the opinion of VE Malik that a person with Brodrick's age, education, work experience, and RFC could perform the jobs of routing clerk, small product assembler, and wire assembler. (AR 17). Thus, the ALJ determined that Brodrick was not disabled. (AR 18).

## IV

Brodrick argues four points: 1) the Commissioner and ALJ erred in failing to obtain evidence from the prior record; 2) the ALJ erred in not ensuring medical records were complete for an unrepresented person; 3) the ALJ erred in failing to adopt the credibility of his pain as a limitation; and 4) the ALJ failed to consider all his impairments in establishing his RFC.

Pursuant to 42 USC § 405(g), the Commissioner's findings must be sustained by the Court if they are supported by "substantial evidence." 42 USC § 405(g). The entire administrative record must be reviewed for substantial evidence which is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Skinner v Astrue*, 478 F3d 836, 841 (7th Cir 2007), quoting *Richardson v Perales*, 402 US 389, 401 (1971). The Court may not substitute its judgment for that of the ALJ. *Schmidt v Apfel*, 201 F3d 970, 972 (7th Cir 2000). Furthermore, the Court will not review the credibility determinations of the ALJ unless the determinations lack an explanation or support in the

record. *Elder v Astrue*, 529 F3d 408, 413-14 (7th Cir 2008). The ALJ must "sufficiently articulate his assessment of the evidence to assure us that the ALJ considered the important evidence . . . and to enable us to trace the path of the ALJ's reasoning." *Carlson v Shalala*, 999 F2d 180, 181 (7th Cir 1993).

## A

Brodrick first argues that the Commissioner and ALJ erred in failing to obtain evidence from the prior record that appears in the Exhibit List attached to ALJ Welsch's November 16, 2009 Decision. Specifically, Brodrick argues that none of his medical records pre-2010 are part of the second record that was before ALJ Schwartz, that he mentioned those records as supporting his position in the second application, and that he was relying upon the second ALJ having those records. Brodrick acknowledges that the November 16, 2009 Decision is *res judicata*, but he says the records from the first Decision are important because he has a degenerative disease that progressively deteriorates. He contends that if the previous records were in the new file, the second ALJ would have most likely adopted ALJ Welsch's greater limitations regarding his right arm problem that appeared in the first Decision. Because Brodrick's second argument is closely related to his first argument, the two will be considered together.[5] In his second argument, Brodrick argues that the ALJ erred in not ensuring that the medical records were complete for an unrepresented person. Brodrick particularly argues that records on his ankle are critical to the consideration that he can do light work, and that missing such old records as to his ankle significantly affects the determination of his RFC.

In response to his first and second arguments, the Commissioner notes that the existence of the prior ALJ Decision was important to establishing the

---

[5] Moreover, the Commissioner's Motion for Summary Affirmance provides a combined response to Brodrick's first two arguments in his Motion for Summary Judgment.

11

availability of reopening. The Commissioner further notes that the prior Decision was important to the time period which could not be considered by the second ALJ due to administrative *res judicata*, absent reopening. The Commissioner argues that the field office did not submit the prior claims file to the state agency because the prior claims file was electronic; hence, there was no physical file to request or submit to the state agency. The Commissioner further argues that the Hearings, Appeals and Litigation Law Manual (HALLEX)[6] states that in most cases, an ALJ may decide whether or not admission of certain prior-claim evidence is necessary, and need not discuss that evidence unless it is admitted. The Commissioner further counters Brodrick's first and second arguments by arguing that Brodrick has not demonstrated why the evidence before the ALJ was "insufficient" or why the ALJ should have found himself unable to reach a conclusion on the evidence that was before him.

Certainly, an ALJ has a heightened duty to develop the record when a claimant is unrepresented. *Johnson v Barnhart*, 449 F3d 804, 808 (7th Cir 2006). However, how much evidence to gather is typically left to the reasoned judgment of the Commissioner, and a significant omission is usually required before the court will find that the Commissioner failed to assist a *pro se* claimant in developing the record fully and fairly. *Luna v Shalala*, 22 F3d 687, 692 (7th Cir 1994).

20 CFR § 404.1512(d) provides, in relevant part, that the Social Security Administration has the following responsibility in regard to evidence submitted for consideration of impairments:

> Before we make a determination that you are not disabled, we will develop your completed medical history for at least the 12 months

---

[6] The HALLEX "is a policy manual written to convey 'guiding principles, procedural guidance and information to the Office of Hearing and Appeals Staff.'" *DiRosa v Astrue*, 2012 WL 2885112, *5 (ND Ill), quoting HALLEX, Chapter I-1-001.

12

> preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary . . . (2) By "complete medical history," we mean the records of your medical source(s) covering at least the 12 months preceding the month in which you filed your application.

20 CFR § 404.1512(d) and (d)(2). The List of Exhibits attached to ALJ Schwartz's Decision show that some medical records, like those from Brodrick's primary care physician Dr. Wagner, go back more than 12 months preceding August 17, 2010 (the date Brodrick filed his second application for DIB and SSI). (AR 22).

Also, while Brodrick essentially argues that the records from the first ALJ's Decision were necessary to the second ALJ's consideration given the degenerative progression of some of his impairments, he does not indicate which of those previous records would demonstrate that the ALJ committed a significant omission in developing the record. As the Commissioner correctly argues, this Court cannot speculate on what the prior records would or would not show. Indeed, "even a *pro se* litigant bears some responsibility for making a record." *Luna*, 22 F3d at 692. "Mere conjecture or speculation . . . is insufficient to warrant a remand" and a claimant must instead set forth specific, relevant facts such as medical evidence that the ALJ did not consider. *Nelms v Astrue*, 553 F3d 1093, 1098 (7th Cir 2009). Here, Brodrick identifies no medical records or any other records that were previously submitted with his first applications for DIB and SSI that should have been included in the second ALJ's consideration of Brodrick's second applications for DIB and SSI. Interestingly, in arguing that the ALJ erred in not ensuring his medical records were complete, Brodrick cites to an ankle exam dated May 6, 2007 which *was* in the second ALJ's record under review. See (AR 260). Finally, as the Commissioner notes, Brodrick had the ability to obtain his prior claim records which would have enabled him at this stage to identify discrete parts of those prior claim records in order to support his

current position that the ALJ erred in failing to obtain evidence from the prior record. Accordingly, Brodrick has not shown that the ALJ committed a significant omission in developing Brodrick's record fully and fairly, or that the ALJ otherwise erred in failing to obtain evidence from the prior record.

B

Brodrick next argues that the ALJ erred in failing to adopt the credibility of Brodrick's pain as a limitation. He contends that he immediately opined at the hearing before the ALJ that he would be in pain and that was the issue he wanted the ALJ to concentrate on. He also takes issue with the following in regard to the ALJ's credibility determination: that the ALJ failed to develop the line of questioning following Brodrick's responses to the ALJ at the hearing that the doctor informed him that after his fourth surgery, it would be very easy to re-tear the shoulder; that there is nothing in the record to justify the ALJ's conclusion as to only a "light" weight restriction; the inadequacy of treatment records where they did not include the surgery records following the February 2012 shoulder surgery; that Brodrick's testimony indicated pain and problems with his knees, shoulder, arm, and hands; that Mrs. Brodrick's testimony indicated her husband had problems with his right arm and his hands; that the ALJ did not explore what it meant when Dr. Yakin reported that Brodrick could do various activities "with help;" and that the ALJ erroneously relied upon Dr. Yakin in determining Brodrick's physical capacities though she performed a psychological evaluation.

The Commissioner understands Brodrick's challenge as one to the ALJ's credibility finding and RFC finding. Accordingly, the Commissioner asserts that the ALJ's credibility determination was not patently wrong. The Commissioner argues that the ALJ identified and discussed specific activities Brodrick engaged in which went well beyond the type of "minimal daily activities" described in

14

other Social Security cases where the claimant's testimony on his/her daily activities did not undermine or contradict the claimant's claim of disabling pain. The Commissioner argues that the ALJ particularly discussed how Brodrick babysat his grandson for compensation in finding that Brodrick engaged in a "relatively active lifestyle." The Commissioner disputes that the ALJ erred in discussing the factual information conveyed by Brodrick to Dr. Yakin regarding Brodrick's activities of daily living. The Commissioner also disputes that the ALJ can be faulted for not discussing non-existent evidence regarding Dr. Yakin's report that Brodrick could do various activities "with help." As for the RFC finding, the Commissioner argues that the ALJ's RFC finding matched that of the state agency physician, Dr. Richard Smith, who translated Dr. Taiwo's findings into work-related functional limitations and that of the state agency physician who affirmed Dr. Smith's findings.

Determinations of credibility made by the ALJ will not be overturned unless the findings are patently wrong. *Shideler v Astrue*, 688 F3d 306, 310-11 (7th Cir 2012). "Only if the trier of fact grounds his credibility finding in an observation or argument that is unreasonable or unsupported . . . can the finding be reversed." *Sims v Barnhart*, 442 F3d 536, 538 (7th Cir 2006) (citation omitted). SSR 96–7p instructs that when "determining the credibility of the individual's statements, the adjudicator must consider the entire case record," and that a credibility determination "must contain specific reasons for the finding on credibility, supported by the evidence in the case record." An ALJ should consider elements such as objective medical evidence of the claimant's impairments, the daily activities, allegations of pain and other aggravating factors, "functional limitations," and treatment (including medication). *Scheck v Barnhart*, 357 F3d 697, 703 (7th Cir 2004); *Rice v Barnhart*, 384 F3d 363, 371 (7th Cir 2004). "Without an adequate explanation, neither the applicant nor subsequent

reviewers will have a fair sense of how the applicant's testimony is weighed." *Steele v Barnhart*, 290 F3d 936, 942 (7th Cir 2002).

Here, the ALJ discussed at length Brodrick's complaints of pain in his right shoulder, arm, and knees throughout his Decision. The ALJ particularly noted the pain medication that Brodrick took – Tylenol before his most recent shoulder surgery in February 2012 and Norco following that surgery. The ALJ discussed the doctors' notes regarding Brodrick's pain and ailments, including what various physical examinations of his range of motion revealed, the orders for physical therapy, and Brodrick's progression in physical therapy. The ALJ also discussed the extent to which Brodrick performed daily activities, including that he engaged in certain activities "with help." The ALJ listed the activities Brodrick engaged in and that such activities "indicate that Mr. Brodrick is able to sit, stand, walk, lift, etc." (AR 16). Though the ALJ did not delve further into Brodrick's testimony that his doctor said it would be very easy to re-tear his shoulder, the ALJ did address Dr. Gernant's March 1, 2012 note which provided that the tear was "quite repairable." The Court is mindful of the fact that "[w]hen assessing an ALJ's credibility determination, [the Court] [does] not . . . undertake a *de novo* review of the medical evidence that was presented to the ALJ," but rather "merely examine[s] whether the ALJ's determination was reasoned and supported." *Elder*, 529 F3d at 413. In the end, the ALJ's discussion of the factors relevant to a credibility determination provides a fair sense of how he weighed Brodrick's testimony. In other words, the ALJ's credibility determination sufficiently contained both explanation and support in the record. *Shideler*, 688 F3d at 311. His findings are not patently wrong. *Skarbek v Barnhart*, 390 F3d 500, 504-05 (7th Cir 2004).

## C

Brodrick finally argues that the ALJ failed to consider all of his impairments in establishing his RFC. Brodrick says that the ALJ did not consider his problems rotating his right wrist, numbness in his hand, lack of bilateral grip, needing to extend his leg, needing help with activities, pain that would require him to stop and be off task, and inability to stoop or crouch. The Commissioner addresses here Brodrick's argument that the possibility of re-tearing his shoulder implied some weight restrictions, countering that the ALJ did not abuse his discretion by not obtaining an updated medical opinion in the absence of any particular evidence that Brodrick's recent surgery reduced his long-term ability to use his right upper extremity. In regard to Brodrick's alleged right arm and hand symptoms, the Commissioner points out that the ALJ recognized Brodrick's shoulder surgery had occurred in the month prior to the hearing and had temporarily made things worse, including that Brodrick displayed problems with his right hand shortly after surgery that his doctor thought might be related to his temporary use of a sling. The Commissioner also points out that the ALJ tied his RFC finding to the Social Security Act's durational requirement by finding that Brodrick "has very severe impairments, but the medical evidence does not support a finding that he has been incapable of performing work within the residual functional capacity identified by the State Agency evaluators, and as articulated at finding number 5 [the RFC finding as articulated by the ALJ] above, for any period approaching twelve months." (AR 16). The Commissioner points out that the ALJ contrasted Brodrick's hand complaints with a listing of Dr. Taiwo's relevant objective findings. In regard to Brodrick's alleged inability to stoop or crouch, the Commissioner points out that an ALJ's credibility findings need not specify which statements were not credible, and so the ALJ properly rejected all limitations claimed by Brodrick that extended beyond the

limits the ALJ found Brodrick was able to do things such as crouch. The Commissioner also details how the ALJ addressed and did not ignore Brodrick's knee-based allegations. Finally, the Commissioner argues that the ALJ's failure to include the additional limitations of sedentary lifting limits, only stand/walk for two hours a day, and only occasionally reach, handle, and finger with his right dominant arm in his RFC finding was harmless error where the VE testified that 4,100 jobs in Illinois would still be available to a hypothetical individual like Brodrick with such additional limitations.

Brodrick is correct that in determining a claimant's RFC, an ALJ should consider medical and non-medical evidence in the record, including severe and non-severe impairments. 20 CFR § 404.1545(a)(2) provides that:

> If you have more than one impairment. We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not "severe" . . . when we assess your residual functional capacity.

20 CFR § 404.1545(d) provides in relevant part that:

> When you have a severe impairment(s), but your symptoms, signs, and laboratory findings do not meet or equal those of a listed impairment in appendix 1 of this subpart, we will consider the limiting effects of all your impairment(s), even those that are not severe, in determining your residual functional capacity.

Here, at the hearing, the ALJ asked VE Malik to assume the sedentary limitations of hypothetical three, and to further assume that such an individual had no more than occasional use of his right upper extremity for reaching in any direction, handling, and fingering. (AR 47). In other words, the ALJ posed an additional hypothetical to the VE which accounted for the limitations presented by Brodrick's hand symptoms. The fact that the ALJ's RFC did not include consideration of Brodrick needing help with activities does not amount to error

18

on the ALJ's part. As discussed above, 20 CFR § 404.1545(a)(2) provides that the ALJ should include all of a claimant's medically determinable impairments. The alleged need for help doing activities is not a medically determinable impairment. See also *Simila v Astrue*, 573 F3d 503, 520 (7th Cir 2009) ("Ordinarily, an ALJ's hypothetical questions to a VE must include all limitations supported by medical evidence in the record") (internal citation omitted). Although at no time did the ALJ pose a hypothetical to the VE which included limitations posed by pain that would require the individual to stop and be off task or the inability to stoop or crouch, he was not required to do so.

Specifically, the ALJ "is required only to incorporate into his hypotheticals those impairments and limitations that he accepts as credible." *Simila*, 573 F3d at 521. The ALJ's Decision here detailed Brodrick's complaints of pain and the reasons why the extent to which he alleged pain was discredited. The ALJ's Decision also detailed Brodrick's knee disorders and the reasons why the extent to which Brodrick alleged his knees limited him was discredited. Thus, the ALJ did not err in not considering the "problems" in his RFC as identified by Brodrick in his Motion for Summary Judgment, because the ALJ was justified in discounting Brodrick's credibility as to many of those "problems" to therefore not include them in his hypotheticals to the VE. Id. Moreover, as the Commissioner points out, the ALJ did pose a hypothetical to the VE which included right arm and hand limitations, and the VE responded that 4,100 jobs still existed for such an individual. (AR 46-47). Brodrick is not entitled to remand for the alleged error that the ALJ failed to consider all of Brodrick's impairments in establishing his RFC. Throughout his Decision, the ALJ sufficiently articulated his assessment of the evidence to enable the Court to trace the path of his reasoning. See *Carlson*, 999 at 181.

# V

For the reasons set forth above, the Court recommends that the Plaintiff's Motion for Summary Judgment (Doc. 11) be DENIED and the Commissioner's Motion for Summary Affirmance (Doc. 15) be GRANTED.

The parties are advised that any objection to this Report and Recommendation must be filed in writing with the Clerk within fourteen (14) working days after service of this Report and Recommendation. FRCP 72(b)(2); 28 USC § 636(b)(1). Failure to object will constitute a waiver of objections on appeal. *Johnson v Zema Systems Corp*, 170 F3d 734, 739 (7th Cir 1999); *Lorentzen v Anderson Pest Control*, 64 F3d 327, 330 (7th Cir 1995).

Entered on February 19, 2015.

s/Jonathan E. Hawley
U.S. MAGISTRATE JUDGE